J-S86014-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: M.R.P., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.P. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 811 WDA 2016 |

Appeal from the Order Entered May 10, 2016
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  CP-02-AP-0000205-2015

BEFORE:  GANTMAN, P.J., MOULTON, J., STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:          **FILED NOVEMBER 21, 2016**

Appellant, M.P. ("Mother") appeals the order of the Allegheny County Court of Common Pleas granting the petition of the Allegheny County Office of Children, Youth, and Families ("OCYF") to involuntarily terminate Mother's parental rights to her minor, dependent daughter, M.R.P. ("Child"), pursuant to 23 Pa.C.S. § 2511(a)(2), (a)(5), (a)(8) and (b).[1]  We affirm.

In late August 2014, Mother gave birth to Child six weeks before her scheduled due date.  As Child was born with a condition in which her bowels formed on the outside of her body, Child was hospitalized at the Children's Hospital of Pittsburgh (CHP) for a month.  Mother rarely visited Child during

---

[1] The trial court involuntarily terminated the parental rights of Child's unknown father pursuant to 23 Pa.C.S. §§ 2511(a)(1), (a)(2), (a)(5), and (a)(8).

* Former Justice specially assigned to the Superior Court.

this hospitalization. Child was released into Mother's care on October 3, 2014, after Mother was given specific instructions on Child's aftercare.

OCYF received a report from CHP after hospital personnel could not reach Mother to ensure that Child was gaining weight and that Mother was properly changing the bandage and caring for Child's incision from surgery. The hospital later indicated that Mother did not keep Child's follow-up medical appointments and failed to feed her the recommended high-calorie formula for low-weight babies. Mother continued to miss appointments with the hospital and with OCYF.

OCYF attempted to visit Mother's cousin's home where Mother resided with Child, but Mother was not there. After discovering Mother was sleeping with Child in the same bed, OCYF provided Mother a Pack and Play as Mother claimed she did not have a safe place for Child to sleep. Mother moved with Child to Maternal Grandfather's home, which OCYF felt was unsafe due to Maternal Grandfather's criminal record. Mother herself had been declared a dependent child due to concerns that Maternal Grandfather had sexually inappropriate contact with Mother when she was a child. There was also reports of domestic violence between Mother, Maternal Grandfather, and Maternal Grandfather's paramour.

On October 24, 2014, OCYF sought emergency custody of Child after she was admitted to the hospital for dehydration, malnutrition, oral thrush, and complications from the improper care of her incision wound. Mother had not changed the original bandage, which smelled and was stained. Child

remained in the hospital for five days as the bandage had to be surgically removed from her body. Upon her release, OCYF placed Child in foster care. On January 28, 2015, the trial court adjudicated Child dependent.

OCYF created a Family Service Plan ("FSP") for Mother defining the following goals: Mother was required to (1) maintain visitation with Child, (2) obtain appropriate housing, (3) attend domestic violence counseling, (4) undergo a mental health evaluation and comply with the subsequent recommendations, and (5) obtain a drug and alcohol evaluation and follow the recommendations.

Mother submitted to a drug and alcohol evaluation, but failed to comply with outpatient treatment. Although twenty-six drug screenings were scheduled, Mother only submitted to two urine screenings, both of which tested positive for marijuana. Mother attempted to address her mental health goal by undergoing mental health evaluations, including one with Dr. Beth Bliss, a licensed psychologist with Allegheny Forensic Associates. Mother was discharged from two mental health programs for her non-compliance and did not seek further mental health treatment. Mother was unable to secure housing that would be adequate for Child, but instead moved frequently between relatives' homes. Although Mother was required to visit Child regularly, she only attended eighteen out of forty-four scheduled visits. On August 5, the trial court reduced Mother's visitation due to her non-compliance. On her last visit, Mother did not play with Child, left an hour early, and told social workers that Child needed to be changed.

On December 21, 2015, OCYF filed a petition to terminate Mother's parental rights. The trial court held a termination hearing on May 6, 2016, at which OCYF presented the testimony of Dr. Bliss and Betsy Ann McMaster, OCYF case supervisor. Additionally, Mother testified on her own behalf. In an order entered May 10, 2016, the trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (a)(5), (a)(8), and (b). On June 6, 2016, Mother, through appointed counsel, filed a notice of appeal along with a concise statement of errors complained of on appeal as required by Pa.R.A.P. 905(a)(2) and Pa.R.A.P. 1925(a)(2)(i).

On appeal, Mother raises one issue for our review:

Did the trial court abuse its discretion and/or err as a matter of law in concluding that Allegheny County Children, Youth, and Families met its burden of proving that termination of Birth Mother's parental rights would meet the needs and welfare of the Child pursuant to 23 Pa.C.S. § 2511(b) by clear and convincing evidence?

Mother's Brief, at 5.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817, 826 (2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.*

at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, [608 Pa. 9, 27, 9 A.3d 1179, 1190 (2010)].

***In re T.S.M., T.R.M., T.J.M., T.A.M., & N.D.M.***, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G. & J.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, controls the termination of parental rights, and requires a bifurcated analysis, as follows:

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (a)(5), (a)(8), as well as (b). However, Mother concedes that OCYF presented sufficient grounds to show her conduct constituted grounds for the termination of her parental rights under Section 2511(a). Thus, we may proceed to review Mother's argument that termination of her parental rights does not best serve the needs and welfare of Child pursuant to Section 2511(b), which provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

With regard to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental,

physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M. [a/k/a  E.W.C. & L.M. a/k/a L.C., Jr.]*, [533 Pa. 115, 122-23, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267.

"[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted).

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 533–536 (Pa.Super.2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa.Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa.Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010),

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child,

- 7 -

and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Upon reviewing the record, we agree with the trial court's conclusion that termination of Mother's parental rights will clearly serve to promote the needs and welfare of Child. The trial court emphasized that there was no indication that an emotional bond exists between Mother and Child to the extent that the termination of Mother's parental rights would cause Child to suffer extreme emotional consequences. The trial court relied on the testimony of Dr. Bliss, who after observing Mother's interaction with Child, opined that "there did not seem to be a parental bond." Notes of Testimony (N.T.), 5/6/16, at 10. Dr. Bliss observed that Mother was very "unnatural in her interactions" as if she was trying to impress the observers and not seeking the Child's attention. N.T. at 8. Dr. Bliss observed that Mother did not understand Child's developmental level, allowing her to put various objects in her mouth that were choking hazards and asking Child to do tasks that were inappropriate for her age and development. Moreover, Dr. Bliss

did not notice any verbal or physical affection between Mother and Child. As a result, she opined that the bond between Mother and Child could be severed without detrimental harm to Child.

In contrast, Child has been in the care of her Foster Parents since October 24, 2014 when she was only six weeks old. Despite her fragile medical state upon birth, Child has thrived in Foster Parents' care, is up to a normal weight, and is very healthy. Foster parents demonstrate a thorough understanding of Child's medical needs and have followed through with all of Child's medical appointments and numerous developmental services (including occupational therapy, physical therapy, and speech therapy). Dr. Bliss observed Child interact with Foster Parents in a warm, loving manner as they engaged in play and age-appropriate activities. Dr. Bliss opined that the relationship between Child and Foster Parents "seemed to be more consistent with psychological parents, the bonds that she had with them." N.T. at 10. Further, Dr. Bliss asserted that Child's separation from Foster Parents "would be pretty traumatic" for Child as she does "have a very close and strong bond to them." N.T. at 27. Foster parents wish to adopt Child.

Furthermore, we emphasize that for the entirety of Child's life, Mother has shown little interest in promoting Child's physical, developmental, and emotional needs. When Child was six weeks old, Child required additional hospitalization due to Mother's neglect in failing to follow through with critical medical recommendations of providing Child proper nutrition and caring for Child's surgical incision from her abdominal surgery after birth.

Mother repeatedly missed Child's medical appointments after her hospitalization and denied the significant nature of Child's medical history.

Up to the point that OCYF filed the termination petition, Mother did not show interest in learning to care for Child's special needs, was not been involved or aware of Child's numerous therapeutic services, and did not ask for updates on Child's condition or progress. In discussing Child's medical needs, Mother could not identify Child's birth defect as gastroschisis and the only information she could provide about Child's health is that Child "has to eat certain things to be healthy." Dr. Bliss Report, at 7. Mother knew that Child would need surgery for a hernia, but did not know if Child has undergone this procedure. Mother has not shown that she is able to address Child's ongoing medical and developmental needs.

With respect to Child's emotional needs, Mother did not place value in building a relationship with her as she missed twenty-six of her forty-four scheduled visits with Child. Moreover, Mother has not shown she can offer Child stability, as she has not obtained housing suitable for her and Child and shows no initiative in seeking mental health or drug treatment. Thus, as confirmed by the record, the developmental, physical, and emotional needs of Child would best be served by the termination of Mother's parental rights. Accordingly, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under Sections 2511(a) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  11/21/2016